IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| RISINGER HOLDINGS, LLC, AND | § | |
| RONALD K. RISINGER DDS, MS, P.C. | § | |
| D/B/A GULF COAST ORTHODONTIC | § | |
| SPECIALISTS | § | |
| Plaintiffs | § | |
| | § | CIVIL ACTION NO.  1:20-CV-00176 |
| v. | § | JUDGE MICHAEL J. TRUNCALE |
| | § | |
| SENTINEL INSURANCE COMPANY, | § | |
| LTD. AND THE HARTFORD | § | |
| FINANCIAL SERVICES, GROUP, INC. | § | |
| Defendants | § | |

## ORDER ON DEFENDANTS' 12(B)(1), 12(B)(2), AND 12(B)(6) MOTIONS TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

The matters before the Court are the Defendant, The Hartford Financial Services Group, Inc.'s Rule 12(b)(1), 12(b)(2), and 12(b)(6) Motions to Dismiss [Dkt. 22] and the Defendant, Sentinel Insurance Company, Ltd.'s Rule 12(b)(6) Motion to Dismiss [Dkt. 18].

## BACKGROUND

Risinger Holdings, LLC ("Risinger")[1] owns several orthodontic practices that bracket the Gulf Coast. Risinger had an insurance policy ("Policy") issued by the Sentinel Insurance Company, Ltd. ("Sentinel"). Last year, when coronavirus lockdowns were ordered across the United States, Sentinel, like other insurers, braced itself for claims and resulting lawsuits. Then, with increasing momentum, courts began dismissing cases in which insurers argued that, because of so-called "virus exclusions," their policies provided no coverage for business income losses caused by the coronavirus. Sentinel deploys that same argument here.

Sentinel is a subsidiary of The Hartford Financial Services Group, Inc. ("Hartford"), a

---

[1] The plaintiffs include two corporate entities and two individuals, but they are all represented by the same attorneys from the Brasher Law Firm, PLLC. For clarity, the Court refers to all plaintiffs as "Risinger."

Delaware company headquartered in Connecticut. Like some parents today, Hartford's relationship with its subsidiaries is a distant one: it does not issue or administer claims, it is not a party to the contracts its subsidiaries enter, and it does not collect premiums. Accordingly, Hartford avers that 12(b)(1), 12(b)(2), and an independent basis for 12(b)(6) dismissal are warranted, since it is entirely uninvolved in this dispute. But it also hedges its bets. Should the Court deny its Motion, it joins in Sentinel's Motion to Dismiss under Rule 12(b)(6). [Dkt. 18 n.1].

For the reasons provided below, the Court **GRANTS** Hartford's Motions to Dismiss under Rules 12(b)(1), 12(b)(2), and 12(b)(6) [Dkt. 22] but **DENIES** Sentinel's Motion to Dismiss under Rule 12(b)(6) [Dkt. 18].

## DISCUSSION

### I. Hartford's Motion to Dismiss on 12(b)(1), 12(b)(2), and 12(b)(6) Grounds.

Anytime a federal court makes a decision, the "[j]urisdictional questions comes first." *Calcote v. Texas Pac. Coal & Oil Co.*, 157 F.2d 216, 218 (5th Cir. 1946). Hartford's Motion challenges (1) the Court's subject matter jurisdiction, because Risinger lacks Article III standing to sue; (2) the Court's personal jurisdiction, because Hartford lacks minimum contacts with the forum; and (3) the sufficiency of Risinger's Complaint, because it fails to state a claim against Hartford, a non-party to the insurance contract. The Court begins its analysis with the two threshold jurisdictional questions.

#### A. Legal Standards and Analysis.

##### 1. *Subject Matter Jurisdiction.*

If a district court concludes that it lacks subject matter jurisdiction over a matter, it must dismiss. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). The burden of establishing subject matter jurisdiction lies with the plaintiff, and it requires proof by a preponderance of the evidence. *Southern Recycling, L.L.C v. Aguilar*, 982 F.3d 374, 379 (5th Cir. 2020). When resolving

2

jurisdictional questions, a district court may properly consider evidence outside the pleadings without converting a motion to dismiss into a motion for summary judgement. *RLB Contr., Inc. v. Butler*, 773 F.3d 596, 601 (5th Cir. 2014).

Even if some basis for original jurisdiction exists, Article III standing remains a non-negotiable component of subject matter jurisdiction. *Ortiz v. Am. Airlines, Inc.*, 5 F.4th 622, 627 (5th Cir. July 19, 2021). To establish Article III standing, a plaintiff must show (1) an "injury in fact," (2) "fairly traceable" to the defendant's "challenged conduct," (3) that is "likely to be redressed" by a favorable decision. *Id.* at 628.

Risinger cannot establish Article III standing because it lacks contractual privity with Hartford and cannot show any injury "fairly traceable" to Hartford's conduct. [Dkt. 22 at 15]. Risinger's claims (Count I for a declaratory judgment; Counts II, IV and V for violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act; and Count VII for breach of the duty of good faith and fair dealing; *see* Dkt. 16 at 16–23) are necessarily predicated on two things: first, Hartford's status an "insurer" under the Policy; and second, whether Risinger's alleged injury, the denial of coverage for business income losses due to the coronavirus, is fairly traceable to conduct by Hartford. But Risinger's own exhibits show that Hartford was *not* an insurer under the Policy, which clearly lists "Sentinel Insurance Company, Limited" as the "insurer." [Dkt. 16-1 at 17]. Risinger's Complaint also does not adequately allege that Hartford engaged in *any* relevant conduct. A sworn declaration avers that Hartford does not underwrite risks; issue or adjust policies; or investigate, handle, or deny claims. [Dkt. 22-1 at 2–3]. Hartford's Form 10-K filed with the SEC declares that it is only a "holding company [with] no significant business operations of its own." [Dkt. 22-1 at 7].

Hartford points to a likely source of confusion. Multiple entities, including the Sentinel Insurance Company, The Hartford Financial Services Group, the Hartford Fire Insurance

Company, and Hartford Financial Products, operate under a trade name: "The Hartford." [Dkt. 22-1 at 2; Dkt. 22 at 14; Dkt. 16-1 at 7]. Risinger's response merely restates conclusory allegations about Hartford's involvement, but also backtracks—acknowledging it may have sued the wrong entity. [Dkt. 26 at 3–5]. Even if Risinger were capable of stating a claim, it has only adequately alleged conduct linked to the group of entities doing business under the trade name, "The Hartford," but not the legal entity, "The Hartford Financial Services Group, Inc." [*see* Dkt. 26 at 5, alleging vaguely that a "Hartford entity" is involved].

"The Hartford," as a trade name, "is not a separate legal entity capable of being sued." *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 634 n.2 (4th Cir. 2002); *Mastro v. Seminole Tribe*, 578 Fed. App'x 801, 803 (11th Cir. 2014); *Emrit v. Pub. Access to Court Elec. Records (PACER)*, No. A-14-CV-461 LY, 2014 U.S. Dist. LEXIS 155631, at *4 (W.D. Tex. 2014); *Hill v. Oria*, No. 07-36424, 2010 WL 5256806, at *11 n.9 (Bankr. S.D. Tex. 2010).[2] Accordingly,

---

[2] Federal Rule of Civil Procedure 17(b)(2) governs the capacity of a corporation to be sued. FED. RULE CIV. PROC. 17(b)(2). It provides a choice-of-law mechanism that points to the state of incorporation. *Jacobs v. Adams*, 601 F.2d 176, 178 (5th Cir. 1979). However, the Rules of Civil Procedure are promulgated under the Rules Enabling Act, 28 U.S.C. § 2072. *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 438 (2010). This means that a federal court sitting in diversity cannot apply a federal rule  if it "abridge[s], enlarge[s] or modif[ies] any substantive right." *Id.*; 28 U.S.C. § 2072(b). Under the Supreme Court's *Erie* jurisprudence, the "capacity to sue or be sued" invokes substantive interests. *See Woods v. Interstate Realty Co.*, 337 U.S. 535, 535–38 (1949). Texas permits "persons to be made parties under [trade names] as well as under individual names." *Dillard v. Smith*, 146 Tex. 227, 230–31 (Tex. 1947). However, the trade name of a Delaware corporation is *not* a separate legal entity capable of being sued. *Cruz v. Lovelace Health Sys.*, No. 1:18-cv-974-RB-SCY, 2019 WL 4016281, at *4, 7–8 (D.N.M. 2019). Therefore, applying Rule 17(b)(2), which itself requires the application of Delaware law, would "abridge, enlarge, or modify" the plaintiff's state-based substantive rights. So, the Court *must* apply state law rather than federal law to decide whether a suit may proceed against a trade name. But which state's law? Texas, Delaware, and Connecticut each have varying degrees of interests. In a diversity case, "a federal court must follow the choice-of-law rules of the state in which it sits." *Stuart v. Spademan*, 772 F.2d 1185, 1195. Texas has adopted as its choice-of-law paradigm the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. *Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 872 (Tex. 2017). Under § 302 of the Restatement, the rights and liabilities of a corporation "are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties" under the § 6 factors. RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 302(1). Absent "unusual" circumstances, the "local law of the state of incorporation" applies. *Id.* § 302(2). Having considered the § 6 factors, the Court finds that Delaware, the state of incorporation, and Connecticut, the principal place of business, have more significant interests than Texas here. The laws of both states agree that a trade name is "not a separate legal entity" that is "capable of being sued." *See Wolfe v. Nobel Learning Cmtys., Inc.*, No. 06-3921 (JBS), 2006 WL 3825137, at *1 (N.D.N.J. 2006); *Cruz*, 2019 WL 4016281, at *4; *Vendrella v, Astriab Family Ltd. P'ship*, 87 A.3d 546, 547 n.2 (Conn. 2014). And if a "trade name does not have a separate legal existence, a plaintiff bringing an action solely against a trade name cannot confer jurisdiction on the court." *Pacheco v. Joseph McMahon Corp.*, 698 F. Supp. 2d 291, 295 (D. Conn. 2010); *McCaffrey v. Windsor at Windermere Ltd. P'ship*, No. 17-460, 2017 WL 1862326, at *2, 6 (E.D. Penn. 2017)

Risinger's injuries are not "fairly traceable" to conduct by either "The Hartford" or Hartford. First, "The Hartford," a non-entity, is incapable of engaging in judicially cognizable conduct, so any complaints about it are a legal nullity. Second, Risinger has not adequately alleged that Hartford, the named defendant, engaged in any conduct at all. *See Black Magic, LLC v. Hartford Fin. Servs. Grp., Inc.*, No. 2:20-cv-1743-BHH, 2021 WL 964969, at *4 (D.S.C. Mar. 15, 2021) (granting defendant's 12(b)(1) motion because defendant was not an "insurer" under the policy and plaintiff's complaint asserted no conduct by defendant fairly traceable to the alleged injury).

Therefore, the Motion to Dismiss under Rule 12(b)(1) is **GRANTED**.

### 2. *Personal Jurisdiction.*

When a court assesses a non-resident defendant's challenge to personal jurisdiction without holding an evidentiary hearing, the plaintiff bears the burden of presenting "sufficient facts" for a *prima facie* case of personal jurisdiction. *Thiam v. T-Mobile USA, Inc.*, No. 4:19-CV-00633, 2021 WL 1550814, at *1 (E.D. Tex. Apr. 20, 2021). The court accepts as true allegations in the plaintiff's complaint, except when they are contradicted by the defendant's affidavits. *Id.* However, "genuine, material conflicts" between the facts in the parties' affidavits and other evidence are construed in the plaintiff's favor. *Id.*

Establishing *in personam* jurisdiction in a diversity case is a two-step dance. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2013). First, a court asks whether a defendant is subject to the jurisdiction of a state court of general jurisdiction under state law. FED. RULE CIV. PROC. 4(k)(1)(A). This requires measuring the reach of the long-arm statute of the state where the federal court sits. *Daimler AG*, 517 U.S. at 125. Second, the court asks if the exercise of personal jurisdiction would be within the limits imposed by the U.S. Constitution. *Id.* But if a long-arm

---

(finding that the trade name of a Delaware corporation was "not . . . a legal entity" allowing for the conferral of jurisdiction); *Coldwell Banker Manning Realty, Inc. v. Cushman & Wakefield of Conn., Inc.*, 47 A.3d 394, 398 (Conn. App. Ct. 2012) ("Because the trade name of a legal entity does not have a separate legal existence, a plaintiff bringing an action solely in a trade name cannot confer jurisdiction on the court.").

statute is construed to extend to the limits of due process, a federal court may skip to the second step. *Id.*; *Jackson v. Tanfoglio Giuseppe S.R.L.*, 615 F.3d 579, 584 (5th Cir. 2010). The Texas Supreme Court has construed Texas' long-arm statute to extend "as far as the federal constitutional requirements of due process will permit." *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002) (citing *U-Anchor Adver., Inc. v. Burt*, 553 S.W.2d 760, 762 (Tex. 1977)). So, the Court focuses only on the due process aspects of the personal jurisdiction question.

The constitutional inquiry requires the court to consider (1) whether a defendant has purposefully availed itself of the protections and benefits of the forum state by establishing "minimum contacts" with the state, and (2) whether the exercise of jurisdiction comports with traditional notions of "fair play and substantial justice." *Tanfoglio*, 615 F.3d at 584. Minimum contacts are satisfied by contacts that create either general or specific jurisdiction. *Thiam*, 2021 WL 1550814, at *2 (citing *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994)). If a plaintiff successfully shows "minimum contacts," the burden shifts to the defendant to show that the exercise of jurisdiction would offend the principles of "fair play and substantial justice." *Id.* at *6 (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006)).

### a. General Jurisdiction.

A corporation is only subject to general jurisdiction when its contacts with the state are so "continuous and systematic" they render it "essentially at home" in the forum state. *Daimler AG*, 571 U.S. at 138–39. Ordinarily, a corporation is only subject to general jurisdiction where it is incorporated or has its principal place of business. *Id.* at 137, 139 n.19. It offends the norms of due process to subject a non-resident corporate defendant to an exercise of personal jurisdiction merely because of its subsidiary's acts. *Id.* at 134–36.[3] Like individuals, corporate entities should be able

---

[3] The standards applied in the Fifth Circuit to assess personal jurisdiction over a "foreign" corporation and a non-resident or out-of-state corporation are identical. *See e.g.*, *Dalton v. R&W Marine, Inc.*, 897 F.2d 1359 (5th Cir. 1990). So, even though much of the authority cited involves "foreign" corporations, properly speaking, it applies here.

to "structure" themselves so as to manage the risk of "where [their] conduct will and will not render them liable to suit." *See id.* at 139 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Accordingly, "vague and overgeneralized assertions that give no indication as to the extent, duration, or frequency of contacts" cannot support general jurisdiction. *Thiam*, 2021 WL 1550814, at *2 (citing *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008)).

Hartford is not subject to general personal jurisdiction in Texas. It was incorporated in Delaware, and its principal place of business is in Connecticut. *See Daimler AG*, 571 U.S. at 137 ("With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction) (internal citations omitted). Risinger has not even attempted to show that Hartford's contacts with Texas are so "continuous and systematic" so as to render it "essentially at home." *Id.* at 138–39. Thus, the Court shifts to assessing specific jurisdiction.

### b.  Specific Jurisdiction.

Specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014). It requires "a substantial connection" with the forum that arises out of the defendant's "suit-related conduct." *Id.* at 284. That is to say, "contacts" created by the "defendant [it]self." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)). This means a plaintiff cannot be the only jurisdictional hook between the defendant and the forum state. *Id.* at 285. The same is true of a corporate subsidiary. To impute the acts of a subsidiary to its parent, the relationship must be "such that they are in reality the same corporation." *Special Indus. v. Zamil Grp. Holding Co.*, 578 Fed. App'x 325, 332 (5th Cir. 2014). But this requires an extraordinary showing—that "the corporate separation [is] a fiction." *Id.*

As discussed earlier, Risinger's allegations against "The Hartford" are legally meaningless. "The Hartford," as a trade name, is a non-entity incapable of engaging in judicially cognizable

conduct for jurisdictional purposes. Risinger also asks the Court to bootstrap personal jurisdiction over Hartford by imputing to it the contacts of its subsidiary, Sentinel. But "the mere existence of a parent-subsidiary relationship will not support the assertion of jurisdiction over a foreign parent." *Dalton v. R&W Marine Inc.*, 897 F.2d 1359, 1363 (5th Cir. 1990). A federal court may only assert jurisdiction over a parent for the actions of its subsidiary when there is a sufficiently "close relationship" to disregard the corporate separateness of the entities. *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983). In a diversity case, the applicable test for alter ego status, as a jurisdictional question, is found by consulting the law of the state where the federal court sits. *Adm'rs of Tulane Educ. Fund v. Ipsen, S.A.*, 450 F. App'x 326, 330 n.5 (5th Cir. 2011). A federal court sitting in Texas applies the *Hargrave* factors to test the alter ego status of corporate entities:

> (1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or daily activities.

*Hargrave*, 710 F.2d at 1160. The *Hargrave* standard is difficult to meet. Even if a plaintiff can show that some factors support an alter ego relationship, "the maintenance of corporate formalities" weighs in favor of "finding that the entities are not alter egos." *Jackson*, 615 F.3d at 588. Here, beyond bare assertions that "[Sentinel] is a wholly or partially owned subsidiary of The Hartford" and that "The Hartford did administer and/or oversee the claims administration process," [Dkt. 16 at 4],  Risinger makes no effort to meet the *Hargrave* standard.[4] Therefore, the Court

---

[4] In Risinger's response to Hartford's Motion to Dismiss, it also asserts that Hartford advertises in Texas through a website. [Dkt. 26 at 6]. However, the exercise of personal jurisdiction over a defendant based on its internet presence requires a plaintiff to demonstrate that a website is more than a "passive advertisement" under the approach of *Zippo Manufacturing Co. v. Zippo Dot Com*, 952 F. Supp. 1119 (W.D. Pa. 1997). *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999). Here, Risinger has not established that Hartford "clearly does business over the Internet by entering into contracts with residents of [Texas]" or even that it runs a website "that allows a user to exchange information with a host computer." *Id.* Therefore, the Court must conclude that Hartford's website is on the "passive" end of the *Zippo* scale and that exercising personal jurisdiction over Hartford would be unwarranted.

cannot impute any of Sentinel's contacts to Hartford. Thus, Risinger's complaint fails to show the "minimum contacts" needed to confer specific jurisdiction under Texas' long arm statute.

Accordingly, the Motion to Dismiss under Rule 12(b)(2) is **GRANTED**.

### 3. *Failure to State a Claim.*

Even if a federal court has power over the case and over the parties, a complaint must still "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal cites omitted). A complaint has "facial plausibility" if the plea provides enough factual content for a court to draw a "reasonable inference" that a defendant is liable for the alleged misconduct. *Id.* In assessing the sufficiency of a complaint, a court can reject legal conclusions camouflaged as factual allegations. *Id.* While this "plausibility" standard is not analogous to a "probability requirement," a plaintiff must show more than a "sheer possibility" that a defendant has acted as alleged. *Id.* at 678. Accordingly, a complaint that merely pleads facts "consistent with" a defendant's liability falls "short of the line between possibility and plausibility." *Id.*

### a. **Count VII: Duty of good faith and fair dealing.**

In Texas, the common law duty of good faith and fair dealing emanate from "the special relationship between the parties." *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 697–98 (Tex. 1994). But such a "special relationship" can only arise between "parties to a contract." *Id.* at 698. Accordingly, in the absence of contractual privity, there can be no special relationship. *Taylor v. Allstate Fire & Cas. Ins. Co.*, No. 5:20-CV-1061-DAE, 2020 WL 8115882, at *3 (W.D. Tex. 2020). As discussed earlier, Risinger's own exhibits show Hartford was not a party to the Policy. Instead, "Sentinel Insurance Company, Limited" is clearly listed as the "insurer." So, no contractual privity exists between Hartford and Risinger. Without contractual privity, there can be no special relationship giving rise to a duty of good faith and fair dealing. *See also Black Magic,*

*LLC*, 2021 WL 964969, at *6 (dismissing plaintiff's complaint for failure to "state a claim against an actual legal entity that is party to the contract"). Therefore, Risinger fails to state a claim with respect to Count VII against Hartford.

### b. Counts II, IV, & V: Texas Insurance Code and Texas Deceptive Trade Practices Act.

The scope of liability under the Texas Insurance Code extends only to persons or entities that actually "play a role" in investigating, processing, evaluating, approving, or denying claims. *See Simmons v. Northfield Ins. Co.*, No. 4:15-CV-374, 2015 WL 5162369, at *4 (E.D. Tex. 2015). The Fifth Circuit has concluded that there is "no reasonable possibility" Texas would allow recovery under either the Texas Insurance Code ("TIC") or the Texas Deceptive Trade Practices Act ("DTPA") without evidence that it was the statutory "person" *himself* who committed an alleged statutory violation. *Hornbuckle v. State Farm Lloyds*, 385 F.3d 538, 545 (5th Cir. 2004). Here, Risinger does not adequately allege that Hartford engaged in *any* relevant conduct, be it underwriting risks; issuing or adjusting policies; or investigating, handling, or denying claims. Thus, Hartford has not "played a role" in any statutory violations sufficient to place itself within the scope of the TIC or the DTPA. Accordingly, Risinger fails to state a claim with regard to Counts II, IV, and V against Hartford.

### c. Count I: Declaratory Judgment.

A declaratory judgment requires a justiciable case or controversy between the parties. *Garza v. DHI Mortg. Co.*, No. 4:19-CV-00780-SDJ-CAN, 2020 WL 7700620, at *13 (E.D. Tex. 2020) (citing *Val-Com Acquisitions Trust v. CitiMortgage, Inc.*, 412 F. App'x 398, 400 (5th Cir. 2011) (per curiam)). If a court dismisses all claims between a plaintiff and a party, there is no basis for a plaintiff to establish a right to a declaratory judgment against that party. *Id.* The Court has determined Risinger cannot state a complaint for any of its other claims against Hartford. Therefore, Risinger has no ancillary right to a declaratory judgment against it. *See also Black*

*Magic, LLC*, 2021 WL 964969, at *6 (citing *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 55–56 (4th Cir. 2011)).

Therefore, the Motion to Dismiss under Rule 12(b)(6) is **GRANTED** as to Hartford.

### B. Conclusion.

It is unclear whether Risinger seeks leave to amend its complaint to name a proper entity. [Dkt. 26 at 5]. A court must "freely give leave when justice so requires." FED. R. CIV. PROC. 15(a)(2). But when a plaintiff seeks leave to amend a complaint by changing a party or the naming of a party, a court must also consider whether the defendants would be subject to "unfair prejudice." Since Risinger has not yet sought leave to amend, the defendants have not yet had an opportunity to brief the Court on whether granting such leave would subject them to "unfair prejudice." So, the Court withholds from deciding this matter.

Therefore, the Defendant, The Hartford Financial Services Group, Inc.'s Motions to Dismiss under Rules 12(b)(1), 12(b)(2), and 12(b)(6) [Dkt. 22] are **GRANTED** and this specific Defendant is dismissed from this action. However, that dismissal is **WITHOUT PREJUDICE** toward Risinger formally moving, at some point in the near future, for leave to file a second amended complaint naming a proper party.

### II.     <u>Sentinel's Motion to Dismiss on 12(b)(6) Grounds and Motion to Strike Defendant's Exhibit B.</u>

Next, the parties dispute whether an exclusion for damage caused by "fungi, wet rot, dry rot, bacteria or virus" bars coverage for business interruption losses caused by government lockdowns during the COVID-19 pandemic.

Risinger's claims are all contingent on the truth of a single premise—that the exclusion does not bar coverage. However, by focusing almost exclusively on refuting that premise, Sentinel's Motion to Dismiss [Dkt. 18] suffers from the same sort of structural defect. A silver bullet, fired at the wrong target, may turn out to be as ineffective as lead: if the term "virus" is

found to be ambiguous, Sentinel's motion will be rendered impotent. Another problem is that Sentinel is clearly an outlier in the industry. Many, if not most, insurers have drafted virus exclusions with far clearer language.[5] So, the reasoning of cases interpreting that substantially different exclusionary language is inapplicable here. Sentinel tries to bolster its position by citing to cases interpreting exclusions identical to this one. However, none of those seem to have considered the confounding problem created by the fact that the Policy defines the term "virus," but with a very different meaning, a "malicious code or similar instruction introduced into or enacted on a computer system." But the greatest interpretive problem is caused by this merry troupe of misfits: "fungi, wet rot, dry rot, bacteria or virus." Under the Court's microscope, applying *noscitur a sociis* does not result in an exclusion that broadly excludes all losses caused by viruses. Instead, under the harsh glare of *contra proferentem*, the "lowest common denominator" between the terms "fungi," "wet rot," "dry rot," "bacteria," and "virus" suggests the exclusion applies only to viruses that cause structural or mechanical damage or failure.

For these reasons, which will be explored more fully below, the Court **DENIES** Sentinel's motion to dismiss under Rule 12(b)(6) [Dkt. 18].

### A. Rules of Construction

When determining whether an insurance policy provides coverage, Texas courts look to "the language of the policy" under a presumption that "parties intend what the words of their contract[s] say." *Gilbert Tex. Constr. L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). Courts generally give policy terms "their ordinary and generally-accepted meaning" unless it appears that the words were used in a "technical or different sense." *Id.* If a

---

[5] In a recent case, the Middle District of North Carolina reviewed a number of such exclusions and found that while State Auto, Republic-Franklin, Frankenmuth Mutual, and Travelers have specifically defined the term "virus" as including the category of viruses "capable of inducing physical distress, illness, or disease," Sentinel alone has left the term undefined within the exclusion. *Natty Greene's Brewing Co., LLC v. Travelers Cas. Ins. Co. of Am.*, 503 F. Supp. 3d 359, 362–63 (M.D.N.C. Nov. 30, 2020).

provision "is susceptible to more than one reasonable interpretation," a court must construe it, within reason, "in favor of the insured" under the doctrine of *contra proferentem. Ranger Ins., Ltd. v. Transocean Offshore Deepwater Drilling, Inc. (In re Deepwater Horizon)*, 728 F.3d 491, 499 (5th Cir. 2013) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)).

This harsh rule results from the "special relationship" of insurers and insureds, which arises out of their "unequal bargaining power." *Ranger Ins., Ltd.*, 728 F.3d at 499 (citing *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 n.1 (Tex. 1998)). Courts must even construe a provision in the insured's favor if the provider's interpretation is "*more* reasonable." *Id.* (citing *Hudson Energy Co.*, 811 S.W.2d at 555) (emphasis original); *see also Certain Underwriters at Lloyds, London v. Law*, 570 F.3d 574, 577 (5th Cir. 2009) (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987) ("If . . . ambiguity is found, the contractual language will be liberally construed in favor of the insured.")). In particular, courts will strictly construe "exceptions or limitations on liability" against the insurer. *Ranger Ins., Ltd.*, 728 F.3d at 499.

## B. Coverage.

Opening up the hood of the Policy reveals a straightforward coverage mechanism. It has an on-switch. The insurer covers "direct physical loss of or physical damage to" anything that constitutes "Covered Property" that is caused by or results from a "Covered Cause of Loss." Then, there are two off-switches. A cause of loss is not covered if it is "Excluded in Section B" or "Limited in Paragraph A.4." And the "Common Policy Conditions" Form voids coverage if the insured commits an act of concealment, misrepresentation, or fraud. [Dkt. 1-2 at 31].

> **SPECIAL PROPERTY COVERAGE FORM**
> **A. COVERAGE**
> We will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called "scheduled premises" in this policy) caused by or resulting from a Covered Cause of Loss.

13

**3. Covered Causes of Loss**
RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
    **a.**  Excluded in Section **B., EXCLUSIONS**; or
    **b.**  Limited in Paragraph **A.4.** Limitations; that follow.

[Dkt. 1-2 at 35–36]. Without deciding the issue definitively, for the purposes of this Order, the Court notes that Risinger's Policy appears to be an "all risks" policy.

An "all risks" policy creates a "special type" of coverage, that extends to "all losses of a fortuitous nature" absent "fraud or other intentional misconduct" and except for losses specifically excluded under the policy. *Dow Chemical Co. v. Royal Indem. Co.*, 635 F.2d 379, 386 (5th Cir. 1981) (citing *Miles v. Royal Indemnity Co.*, 589 S.W.2d 725, 729 (Tex. Civ. App. 1979), *writ ref'd n.r.e.*).[6] Sentinel does not allege concealment, misrepresentation, or fraud by Risinger, so the Court need only consider if any exclusions apply.

**C.  Fungi, Wet Rot, Dry Rot, Bacteria or Virus Exclusion (the "Exclusion").**

Sentinel cites a multitude of decisions construing allegedly "similar" exclusions, but those cases dealt with substantially different exclusionary language, where the term "virus" was expressly defined to mean a virus "capable of inducing physical distress, illness or disease."[7] So, the Court will not bootstrap the reasoning of those cases to this one, and turns instead to the parties'

---

[6] In *Dow Chemical*, the Fifth Circuit construed a rather similar coverage scheme as an "all risks" policy. The specific language at issue was: "This policy insures against all risks of direct physical loss of or damage to insured property from any external cause except as provided elsewhere in the policy." *Dow Chemical Co. v. Royal Indem. Co.*, 635 F.2d 379, 385 (5th Cir. 1981).

[7] *See e.g.*, *Diesel Barbershop, LLC v. State Farm Lloyds*, 479 F. Supp. 3d 353, 357 (W.D. Tex. Aug. 13, 2020) (Ezra, J.); *Turek Enters. v. State Farm Mut. Auto. Ins. Co.*, 484 F. Supp. 3d 492 496 (E.D. Mich. Sept. 3, 2020) (Ludington, J.); *Martinez v. Allied Ins. Co. of Am.*, 483 F. Supp. 3d 1189, 1191–92 (M.D. Fla. Sept. 2, 2020) (Badalamenti, J.); *10E, LLC v. Travelers Indem. Co. of Conn.*, 483 F. Supp. 3d 828, 832 (C.D. Cal. Sept. 2, 2020) (Wilson, J.); *Hajer v. Ohio Sec. Ins. Co.*, 505 F. Supp. 3d 646, 652 (E.D. Tex. Dec. 7, 2020) (Barker, J.); *Frosch Holdco, Inc. v. Travelers Indem. Co.*, No. 4:20-CV-1478, 2021 WL 1232777, at *1 (S.D. Tex. Feb. 11, 2021) (Hanen, J.); *Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am.*, 499 F. Supp. 3d 288, 291–92 (S.D. Miss. Nov. 4, 2020) (Starrett, J.); *Chester C. Chianese DDS LLC v. Travelers Cas. Ins. Co. of Am.*, No. 20-5702 (MAS) (ZNQ), 2021 WL 1175344, at *1 (D.N.J. Mar. 27, 2021) (Shipp, J.); *Toppers Salon & Health Spa, Inc. v. Travelers Prop. Cas. Co. of Am.*, 503 F. Supp. 3d 251, 254 (E.D. Pa. Nov. 30, 2020) (Wolson, J.); *Mayssami Diamond, Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 3:20-cv-01230-AJB-RBB, 2021 WL 1226447, at *4 (S.D. Cal. Mar. 30, 2021) (Battaglia, J.); *Broadway 104, LLC v. XL Ins. Am., Inc.*, No. 20-cv-3813 (PKC), 2021 WL 2581240, at *1 (S.D.N.Y. June 23, 2021) (Castel, J.); *AFM Mattress Co., LLC v. Motorists Com. Mut. Ins. Co.*, 503 F. Supp. 3d 602, 605 (N.D. Ill. Nov. 25, 2020) (Shah, J.); *Equity Planning Corp. v. Westfield Ins. Co.*, No. 1:20-CV-01204, 2021 WL 766802, at *4 (N.D. Ohio Feb. 26, 2021) (Barker, J.).

main dispute, the scope of an exclusion which purports to exclude losses caused by "fungi, wet rot, dry rot, bacteria or virus":

> **LIMITED BACTERIA OR VIRUS COVERAGE**
> This endorsement modifies insurance provided under the following: **SPECIAL PROPERTY COVERAGE FORM**
> **A. Fungi, Bacteria or Virus Exclusions**
> > **i. "Fungi", Wet Rot, Dry Rot, Bacteria And Virus**
> > We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
> > > **(1)** Presence, growth, proliferation, spread or any activity of "fungi," wet rot, dry rot, bacteria or virus.
> > > **(2)** But if "fungi," wet rot, dry rot, bacteria or virus results in a "specified cause of loss" to Covered Property, we will pay for the loss or damage caused by that "specified cause of loss.
> > This exclusion applies whether or not the loss event results in widespread damage or affects a substantial area.

[Dkt. 1-2 at 101]. Sentinel argues the term "virus" in the Exclusion should be construed to bar coverage for business losses caused by government lockdowns in response to COVID-19. Many courts have accepted that theory in other cases involving Hartford affiliates.[8]

However, there are three things that cloud the meaning of "virus": (1) the presence of a conflicting definition of "virus" in another of the Policy's exclusions; (2) a lack of clarity about the scope of the term "virus" in this exclusion, resulting from its grouping with the terms "fungi," "wet rot," and "dry rot"; and (3) a citation to the same grouping, "fungi, wet rot, dry rot, bacteria and virus," in another exclusion involving structural or mechanical damage or failure.

---

[8] *See Wilson v. Hartford Cas. Co.*, 492 F. Supp. 3d 417, 427 (E.D. Pa. Sept. 30, 2020) (Robreno, J.); *Colgan v. Sentinel Ins. Co.*, 515 F. Supp. 3d 1082, 1085, 1087 (N.D. Cal. Jan. 26, 2021) (Gilliam, Jr., J.); *Ultimate Hearing Sols. II, LLC v. Twin City Fire Ins. Co.*, 513 F. Supp. 3d 549, 553–54, 563 (E.D. Pa. Jan. 14, 2021) (Kenney, J.); *Pure Fitness LLC v. Twin City Fire Ins. Co.*, No. 2:20-CV-775-RDP, 2021 WL 512242, at *1, 4 (N.D. Ala. Feb. 11, 2021) (Proctor, J.); *Digital Age Mktg. Grp. v. Sentinel Ins. Co.*, 512 F. Supp. 3d 1270, 1275–75 (S.D. Fla. Jan. 8, 2021) (Dimitrouleas, J.); *Natty Greene's Brewing Co., LLC v. Travelers Cas. Ins. Co. of Am.*, 503 F. Supp. 3d 359, 362–64 (MD.N.C. Nov. 30, 2020) (Eagles, J.); *Levy v. Hartford Fin. Servs. Grp.*, No. 4:20-cv-00643-SRC, 520 F. Supp. 3d 1158, 1164, 1166–67 (E.D. Mo. Feb. 16, 2021) (Clark, J.); *Founder Inst. Inc. v. Hartford Fire Ins. Co.*, 497 F. Supp. 3d 678, 679–80 (N.D. Cal. Oct. 22, 2020) (Chhabria, J.); *Nahmad v. Hartford Cas. Ins. Co.*, 499 F. Supp. 3d 1178, 1183, 1188–90 (S.D. Fla. Nov. 1, 2020) (Bloom, J.); *BA LAX, LLC v. Hartford Fire Ins. Co.*, No. 2:20-cv-06344-SVW-JPR, 519 F. Supp. 3d 711, 714, 717 (C.D. Cal. Jan. 12, 2021) (Wilson, J.); *Eye Care Ctr. Of N.J., PA v. Twin City Fire Ins. Co.*, No. 20-05743 (KM) (ESK), 2021 WL 457890, at *2–3 (D.N.J. Feb. 8, 2021) (McNulty, J.).

**1.   *A conflicting definition of "virus."***

When "identical words" appear in different parts of the same policy, as a general rule of statutory construction, it is presumed that they "have the same meaning." *Beharry v. Ashcroft*, 329 F.3d 51, 61 (2d Cir. 2003) (Sotomayor, J.) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995)); *see also* Ron Beal, *The Art of Statutory Construction: Texas Style*, 64 BAYLOR L. REV. 339, 388 (2012). Here, the Policy provides an express definition of the term "virus" that conflicts with Sentinel's proposed reading of that term:

> **SPECIAL PROPERTY COVERAGE AMENDATORY ENDORSEMENT**
> This endorsement modifies insurance provided under the following: **SPECIAL PROPERTY COVERAGE FORM**
> **B.** The following changes are made to Section **B., EXCLUSIONS**
> >   **2.** The following exclusion is added to Paragraph **1**:
> > >   **(1)** Destruction or corruption of 'electronic data' caused by a ***virus,*** malicious code or similar instruction introduced into or enacted on a computer system (including "electronic data") or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation." (emphasis added).

[Dkt. 1-2 at 89] (emphasis added). The comma, highlighted above, offsets the term "virus" from the two clauses that follow: clause (a), that starts with "malicious code or similar instruction," and clause (b), that begins with "designed to damage or destroy." In the context of this sentence, grammatical rules suggest clause (a) is a "defining," or restrictive, relative clause, whereas clause (b) is a "non-defining," or non-restrictive relative clause. *See Waak v. Rodriguez*, 603 S.W.3d 103, 114 n.2 (Tex. 2020). This means that "malicious code or similar instruction" *defines* the term "virus."

And Sentinel has not defined the term "virus" differently elsewhere in the Policy. This gives rise to at least a measure of ambiguity. It could even create a "presumption" that, within the Policy, the term "virus" always means "malicious code or similar instruction." *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 184 –85 (5th Cir. 2020) (citing *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)); Beal, *Texas Style*, 64 BAYLOR L. REV. at 388. But

16

even if the Court assumes that the term "virus" in the Exclusion has a different meaning, the presence of the "malicious code" definition still fosters uncertainty. It suggests that the Policy itself contemplates the term "virus" is divisible into smaller subcategories, some of which may have absolutely nothing to do with viruses capable of inducing physical distress, illness, or disease.

### 2. The "common quality" in the Exclusion.

The Supreme Court often says, "words are often known by the company they keep," *Lagos v. United States*, 138 S. Ct. 1684, 1688–89 (2018), but what if, to quote another erudite scholarly source, "one of these things is not like the others"? *See generally* ONE OF THESE THINGS (IS NOT LIKE THE OTHERS), *on* THE SESAME STREET BOOK & RECORD (Columbia Records 1970).

The problem here is that the term "virus" seems to be out of place. And so, the Court should avoid "ascribing" to it "a meaning so broad that it is inconsistent with its accompanying words." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 750 n.29. In such instances, courts apply *noscitur a sociis* and search for the "common quality" in a list of words. *Crocker v. Navient Sols., L.L.C.*, 941 F.3d 206, 219 (5th Cir. 2019). That common quality should be the list's "most general quality—the least common denominator, so to speak—relevant to the context." *Id.* (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 196 (2012)). Here, the common quality, excluding the problematic term "virus," is that each item on the list is capable of causing structural or mechanical damage to covered property.[9]

The term "fungus" is frequently associated with the "natural decomposition [or] decay" of

---

[9] Cases interpreting exclusions for just "fungus, wet rot, dry rot, and bacteria" construe those exclusions in such a fashion. *See Mich. Battery Equip v. Emcasco Ins. Co.*, 317 Mich. App. 282, 286–87 (Mich. Ct. App. 2016) (excluding a claim for damage to a warehouse's roof and trusses); *State Auto Mut. Ins. Co. v. R.H.L., Inc.*, No. 07-1197, 2010 WL 909073, at *15 (W.D. Tenn. 2010) (excluding a claim for damage to a laundry room's "structural members (joists and beams)"); *TRAVCO Ins. Co. v. Ward*, 715 F. Supp. 2d 699, 701–02 (E.D. Va. 2010) (excluding a claim for damages to "[d]rywall," "air conditioning equipment," a "garage door," and "flat screen televisions" due to a pollutant exclusion that included "[s]mog, rust, or other corrosion, mold, fungi, wet or dry rot."); *see also Parker's Farm, Inc. v. Hartford Cas. Ins. Co.*, No. 10-4904 AJB, 2012 WL 13027973, at *6–9 (finding an exclusion for damages caused by "fungus, wet rot, dry rot, bacteria, or virus" likely applied to bar recovery equipment damage caused by Listeria, but not to losses arising out of a consequent product recall, or business income losses, despite the presence of an anti-concurrent cause clause).

wooden structures. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1976 (2002); *see also Sprague v. Safeco Ins. Co. of Am.*, 276 P.3d 1270, 1272–73 (Wash. 2012) (noting that "[i]n the case of a wooden structure, the natural process of deterioration will result in collapse and eventual decomposition of the wood."). Similarly, "wet rot" is defined as "a soft rot in which the decayed tissues are markedly watery; decay of timber by fungi that attack wood having high moisture content." WEBSTER at 599. "Dry rot" is defined as "a decay of seasoned timber caused by certain fungi (as the house fungi and some polypores) that consume the cellulose of wood leaving a mere soft skeleton that is readily reduced to powder." *Id.* at 697. Even "bacteria," like sulfur oxidizing bacteria (*Thiobacilli thioxidans*) are capable of damaging metal and concrete through "microbial corrosion." Env't Prot. Agency, *Solidification/Stabilization Resource Guide*, EPA no. 542-B-99-002 ¶ 75 (1999).

Therefore, it stands to reason that if the term "virus" shares this "common quality," it is limited to a category of viruses capable of causing structural or mechanical damage or failure. *See Urogynecology Specialist of Fla. LLC v. Sentinel Ins. Co.*, 489 F. Supp. 3d 1297, 1302 (M.D. Fla. Sept. 24, 2020) ("Denying coverage for losses stemming from COVID-19 . . . does not logically align with the group of the virus exclusion with other pollutants"); *see also Henderson Rd. Rest. Sys. v. Zurich Am. Ins. Co.*, 513 F. Supp. 3d 808, 825 (N.D. Ohio Jan. 19, 2021) (finding the same exclusion inapplicable because it did not "clearly exclude loss of property caused by a government closure").

### 3.   *"Fungi, wet rot, dry rot, bacteria, and virus" elsewhere in the Policy.*

The foregoing conclusion is bolstered by another of the Policy's exclusions involving the "[p]resence, growth, proliferation, spread or any activity of 'fungi,' wet rot, dry rot, bacteria or virus" which is also tied to structural or mechanical damage. That exclusion, in subsection A.5.j.(2)(a) of the Special Property Coverage Form, bars coverage for losses resulting from laws

or ordinances that require the "demolition, repair, replacement, reconstruction, remodeling or remediation of property":

> **SPECIAL PROPERTY COVERAGE FORM**
> **A. COVERAGE**
>> **5. Additional Coverages**
>>> **j. Ordinance or Law**
>>>> **(2) Additional Exclusions**
>>>>> We will not pay under this Additional Coverage for:
>>>>>> **(a)** The enforcement of any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to . . . the presence, growth, proliferation, spread of any activity of "fungi", wet or dry rot, bacteria or virus;

[Dkt. 1-2 at 41–42]. Here, in subsection A.5.j.(2)(a), the Policy seems to expressly contemplate an interpretation of the term "virus" limited to viruses capable causing structural or mechanical damage or failure. Accordingly, subsection A.5.j.(2)(a) and subsection A.i.(1) (the "virus exclusion") can be read as complementary provisions. One exclusion, subsection A.i.(1), bars recovery for direct losses—virus-induced structural or mechanical damage—while the other, subsection A.5.j.(2)(a), bars recovery for indirect losses—costs incurred when an ordinance or law requires the demolition, repair, or remediation of property due to the virus-induced structural or mechanical damage.

In sum, the term "virus" in the Exclusion, subsection A.i.(1), is susceptible to at least three distinct interpretations. It could mean: (1) "malicious code or similar instruction"; or (2) a sub-category of virus capable of causing structural or mechanical damage or failure; or (3) a sub-category of virus capable of inducing physical distress, illness, or disease. The law is clear. The presence of such ambiguity means the Policy must be construed "liberally" in favor of the insured to provide coverage, especially since the ambiguity distorts the scope of purported "exceptions or limitations on liability." *Ranger Ins., Ltd.*, 728 F.3d at 499; *Certain Underwriters at Lloyds,*

*London*, 570 F.3d at 577.

Therefore, the Exclusion does not bar coverage.

**D. Anti-Concurrent Cause Clause.**

The following portion of the "fungi, wet rot, dry rot, bacteria, or virus" exclusion, *infra*, is referred to as an anti-concurrent-cause clause:

> "Such loss or damage is excluded regardless of any other cause or event that contributes concurrently on in any sequence to the loss."

An anti-concurrent-cause clause bars coverage when an insured submits a claim for losses that were "synergistically" caused by two or more causes, one of which is an excluded cause under a policy. *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 430 (5th Cir. 2007). When the operation of an anti-concurrent cause clause is contingent on the applicability of an exclusion, as is the case here, it is axiomatic that finding the exclusion inapplicable also nullifies the anti-concurrent-cause clause. Nevertheless, it is worthwhile to examine the issue more closely.

In *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597 (Tex. 2015), the Texas Supreme Court faced a similar problem. JAW, the insured, owned an apartment complex in Galveston. *Id.* at 599. A dispute arose when Lexington, the provider, denied a claim after Hurricane Ike. *Id.* at 600. The claim was for business losses caused by city ordinances that prevented apartment complexes from operating if they had "sustained damage equal to or exceeding 50% of their market value." *Id.* The issue was whether the policy's anti-concurrent-cause clause, which excluded coverage "for loss or damage caused directly or indirectly" by flooding, applied. *Id.* at 599. The Texas Supreme Court found the exclusion applied, but only because the operation of the city ordinances was expressly predicated on whether the apartments had actually sustained wind and flood damage. Thus, it was fine to conclude that excluded flood damage had "contributed to cause the enforcement of the city ordinances." *Id.* at 608.

The outcome would have been different, however, if the city ordinances had barred

apartment complexes from operating merely because of flood damage elsewhere in the neighborhood, city, or state. The flood exclusion in *JAW* required there to be actual structural damage to the covered premises. Absent that fact, the exclusion and, by extension, the anti-concurrent clause, could not have applied. That is precisely the situation here. Like the flood exclusion in *JAW*, this Policy's exclusion only applies when "fungi, wet rot, dry rot, bacteria or virus" cause structural or mechanical damage to covered property. But unlike the city ordinances in *JAW*, Governor Abbott's Executive Order, GA-15, did not force Risinger to close all three of its locations because COVID-19 was actually present there. [Dkt. 19-5 at 2]. Instead, the operation of the Order was premised on a finding that the coronavirus posed a danger to "all counties in the State of Texas." Accordingly, the excluded virus damage did not contribute to the passage or enforcement of GA-15. *See Henderson Rd. Rest. Sys.*, 513 F. Supp. 3d at 825 (finding an anti-concurrent-cause clause inapplicable when the operation of lockdown orders was not premised on "the known or confirmed presence" of COVID-19 on the premises).

Sentinel may counter that Risinger's own complaint attests that COVID-19 was "present" at its properties. [Dkt. 16 at 13]. However, the Policy's exclusion is not triggered merely because an employee tests positive for COVID-19, because, as discussed earlier, that situation involves a different category of "virus," one "capable of inducing physical distress, illness or disease." [Dkt. 19 at 9]. By its own terms, under the doctrines of *noscitur a sociis* and *contra proferentem*, the Exclusion applies only to a narrow subcategory of viruses that cause structural or mechanical damage to covered property. *See Henderson*, 513 F. Supp. at 826 (finding an anti-concurrent-cause clause inapplicable when the coronavirus had not "caused, at least in part, damage to" the premises). To bring the point home with a *reductio ad absurdum*, this particular exclusion would also not be triggered if the insured were claiming business losses due to digital files corrupted by

a computer "virus."[10]

Therefore, the Anti-Concurrent Cause Clause does not bar coverage.

### E.  Direct Physical Loss.

Generally, Texas courts require a showing of "distinct, demonstrable, physical alteration of" covered property to constitute a direct physical loss. *Great Am. Ins. Co. v. Compass Well Servs., L.L.C.*, No. 02-19-00373-CV, 2020 WL 7393321, at *14 (Tex. App.—Fort Worth Dec. 17, 2020). But unlike the insurance policies in those cases, which expressly defined "direct physical loss" to constitute "loss or damage," *Id.* at *3, this Policy is different. It defines the scope of coverage by distinguishing between "direct physical loss of *or* physical damage to" covered property. *See Valley Lodge Corp. v. Soc'y Ins. (In re Soc'y Ins. Co. Covid-19 Bus. Interruption Prot. Ins. Litig.)*, No. 20 C 5965, 2021 WL 679109, at *8 (N.D. Ill. Feb. 22, 2021) ("The disjunctive 'or' in that phrase means that 'physical loss' must cover something different from 'physical damage.'"). Sentinel has not directed the Court toward anything in the Policy that defines or clarifies the term "physical loss" with respect to Covered Property. Thus, the "physical loss" component of the coverage provision is ambiguous.

Webster's Dictionary defines "physical" as "of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary." WEBSTER at 1706. The term "loss" is defined as "the act or fact of losing; failure to keep possession; deprivation." *Id.* at 1338. Once again, the rule of *contra proferentem* applies. And so, it is reasonable to construe this ambiguous provision so as to sustain Risinger's claim. Risinger may have suffered direct physical loss due to Governor Abbott's lockdown order by being deprived of the use or full use of the physical space of its covered property, or alternately, because of the severe material losses it endured when it was forcibly excluded from its businesses. *See Valley Lodge Corp.*, 2021 WL 679109, at *9

---

[10] However, it is likely that another exclusion, the one defining "virus" as "malicious code" would apply in such an instance.

(concluding that shutdown orders imposed a "physical" not a "financial" limit on the plaintiffs, and that therefore, the policy provided coverage); *Studio 417 v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 800–01 (W.D. Mo. Aug. 12, 2020) (finding plaintiffs had "adequately alleged a direct physical loss" because loss constitutes "the act of losing possession" and "deprivation" of property); *Henderson Rd. Rest. Sys.*, 513 F. Supp. 3d at 823–24 (finding that plaintiffs' "significant financial losses" were the result of direct physical loss, and so covered under their policy). The only remaining issue regarding coverage, the question of whether the lockdown order was a "direct" or "indirect" cause of Risinger's losses, seems to be a question of fact unripe for determination. *Atwells Realty Corp. v. Scottsdale Ins. Co.*, No. PC-2020-04607, 2021 WL 2396584, at *14 (Super. Ct. R.I. June 4, 2021) ("whether a cause is direct, rather than indirect" is an issue of fact to be resolved by the factfinder.).

Accordingly, the Policy's coverage provision applies to Risinger's claims for business losses due to Governor Abbott's Executive Order, GA-15.[11]

## F.  Conclusion.

It is certainly possible that a document may surface that bolsters Sentinel's argument that

---

[11] The Court briefly addresses Sentinel's other arguments regarding the Additional Coverage provisions for business income losses during "period[s] of restoration" or as a result of "civil authority" orders. Sentinel contends these provisions are rendered "superfluous" or "nonsensical" by construing a "civil authority order" as a covered cause of loss. [Dkt. 18 at 21–22]. But this is a *non-sequitur* of an argument. The covered cause of loss here is physical loss resulting from the coronavirus, a virus capable of inducing physical distress, illness, or disease. So, the Court's reading of the coverage provision and Exclusion can be harmonized with both additional coverage provisions. First, the Business Income provision can be read to say that Sentinel "will pay for the actual loss of Business Income you sustain" for the suspension of operations during a "period of restoration," where the suspension is "caused by direct physical loss  of or physical damage to property. . . resulting from [the coronavirus]." Similarly, the Civil Authority provision can be read to say Risinger will pay for "the actual loss of Business Income you sustain when access to your 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of [the coronavirus]" on "property in the immediate area." Other courts construing similar policy language have found no conflict between allowing coverage for coronavirus-related losses and allowing an insured to recover under the additional coverages provisions. *See Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 488 F. Supp. 3d 867, 877–79 (W.D. Mo. Sept. 21, 2020). And courts have construed the term "immediate area" in similar civil authority provisions to extend considerable distances from covered locations. *See N. Pac. Mgmt. v. Liberty Mut. Fire Ins. Co.*, No. 3:21-cv-004044-HZ, 2021 WL 4073278, *2 (D. Ore. Sept. 7, 2021) (finding coverage extended one mile from the premises). Once again, since so many of the key terms in these provisions have been left undefined, the doctrine of *contra proferentem* requires the Court to construe them in favor of coverage.

the term "virus" was added to the exclusion to bar coverage for viruses, like COVID-19, capable of inducing physical distress, illness, or disease. While the Court has not considered the Insurance Services Office's ("ISO") Draft Provisions in finding the Policy's Exclusion ambiguous, if that exclusion truly were amended after the 2003 SARS outbreak or another pandemic to exclude losses resulting from viruses like the rotavirus, SARS, influenza, or the coronavirus, then internal memoranda, drafts, or emails demonstrating that fact should exist. Without more, however, and in light of the inherent ambiguity of the term "virus," it is difficult to dislodge Risinger's contention that this line of argument is merely an attempt to "rewrite" the Policy. [Dkt. 19 at 18].

Therefore, the Defendant, Sentinel Insurance Company, Ltd.'s Motion to Dismiss under Rule 12(b)(6) [Dkt. 18] is **DENIED**.

**CONCLUSION**

It is **ORDERED** that the Defendant, The Hartford Financial Services Group, Inc.'s Rule 12(b)(1), 12(b)(2), and 12(b)(6) Motions to Dismiss [Dkt. 22] are **GRANTED**, but **WITHOUT PREJUDICE** to the Plaintiff, Risinger, formally moving for leave to file a second amended complaint naming a proper party.

It is also **ORDERED** that the Defendant, Sentinel Insurance Company, Ltd.'s Rule 12(b)(6) Motion to Dismiss [Dkt. 18] is **DENIED**.

**SIGNED this 30th day of September, 2021.**

_Michael J. Truncale_
Michael J. Truncale
United States District Judge